Filed 12/30/14  P. v. Sudduth CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B251321 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA380443) |
| v. | |
| LARRY SUDDUTH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  As modified,  affirmed.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Larry Sudduth appeals from the judgment entered following his conviction by a jury of shooting at an inhabited dwelling and possession of a firearm by a felon, as well as true findings on related firearm-use allegations. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Shooting*

On January 17, 2011 Tinisha Nelson was at her apartment in South Los Angeles with Chaka Holland, Holland's boyfriend and Sudduth. Nelson, Holland and Sudduth had known each other for nearly 20 years and frequently saw one another. They began drinking and smoking marijuana in the morning and continued through the early afternoon. Holland's boyfriend left the apartment around noon. At some time in the early afternoon the building manager called to ask Sudduth to move his car, a white Lexus sedan parked next to Nelson's apartment, because it was blocking the apartment driveway. Sudduth moved the car as requested, then returned to Nelson's apartment.

Nelson, Holland and Sudduth continued to drink, and Sudduth fell asleep on the couch for approximately 30 to 40 minutes. Nelson and Holland decided to play a trick on Sudduth and painted his fingernails and applied lipstick to his lips while he slept. When he awoke, they were laughing. He saw his nails, became very upset and cursed the two women. As he moved toward Nelson to spit at her, Nelson's 17-year-old son, Keontay Lee, who had been upstairs but came down when he heard the argument, intervened and told everyone to leave. Sudduth cursed them again and threatened to come back with "something for you all."

Nelson did not see Sudduth go to his car but heard what she believed to be the engine revving. She continued to drink and talk with Holland. Neither noticed if Sudduth drove away.

A short time later Nelson was standing in the entry way between the kitchen and the front door to the apartment[1] when she heard gunshots. Nelson panicked and raised her hands in the air as she moved away. She was shot in the left hand; and, when she

---

[1] The wooden front door was open, but the metal security door was closed.

ducked toward a couch, another bullet ricocheted off the coffee table and struck her left leg. Holland, who had been standing in the kitchen looking over the driveway, ran to the wooden door and slammed it shut. She was not injured.

After the shots stopped, Holland asked Nelson if she was hurt and told her Sudduth was the shooter. Holland and Lee (who ran downstairs when he heard the shots) each called the emergency hotline. Los Angeles Police Officers Alberto Franco and Ruben Cardenas responded to the calls. While Officer Cardenas stayed with Nelson, Officer Franco interviewed Holland. Holland told the officer she and Nelson had been partying all day with Sudduth, who had become angry when he awoke after a nap to discover they had painted his fingernails. She also told Franco she had seen Sudduth shooting at the house from inside his car, which was parked in the driveway.

After completing their investigation Officers Franco and Cardenas drove to Sudduth's home, located around the corner. Sudduth was not there. The next day another car belonging to Sudduth was found outside his home. Sudduth's nickname "Sleep" had been spray-painted on the car and then crossed out.

Two days after the shooting Holland was interviewed by Los Angeles Police Detective Brian Hun. Holland repeated what she had told Franco—she had seen Sudduth shooting into the apartment. She also told Hun Sudduth was associated with the Carver Park Compton Crips gang.

In addition to her injured hand, in the shooting Nelson suffered a broken hip, which was repaired surgically through insertion of a rod in her leg. She had several complications and permanent damage as a result of her injury.

2. *The Information and Pretrial Proceedings*

Sudduth was charged by information with one count of shooting at an inhabited dwelling (Pen. Code, § 246)[2] and one count of possession of a firearm by a felon (§ 12021, subd. (a)(1)). As to count 1 the information alleged Sudduth had personally inflicted great bodily injury in the commission of the offense (§ 12022.7, subd. (a)). As

---

[2]  Statutory references are to the Penal Code unless otherwise indicated.

to both counts the information alleged Sudduth had suffered a prior conviction for first degree burglary, a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.2, subds. (a)-(d)) and a serious felony within the meaning of section 667, subdivision (a)(1).

Sudduth sought and received permission to represent himself. He pleaded not guilty and filed several motions on his own behalf, including a motion to discover the disciplinary records of the officers who arrested him and investigated the case based on his assertion he had never had weapons in his home and believed the officers had planted them.[3] (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).) The trial court reviewed the personnel records identified by the Department and found none that fell within the scope of Sudduth's request.

Shortly before trial Sudduth rejected the People's offer of a plea agreement contemplating a state prison term of nine years. After negotiations broke down and the trial date was imminent, Sudduth requested to be relieved of his pro per status. The court appointed standby counsel as counsel of record and denied the defense's request for a continuance. On the first day of trial the People sought to amend the information to add a firearm-use allegation to count 1 pursuant to section 12022.53, subdivisions (b), (c) and (d). The court granted the amendment over Sudduth's objection.

3. *The Trial*

The People's case was presented through the testimony of Nelson, Holland and Lee, Officers Franco and Cardenas, and Detective Hun. Nelson described the events preceding the shooting and Sudduth's behavior but was unable to identify Sudduth as the shooter. She stated that Holland had identified Sudduth immediately after the shooting. Holland, however, testified she had not seen the shooter and recanted all of her earlier statements identifying Sudduth as the shooter. To cast doubt on her retraction, the People were permitted to introduce her prior statement to Hun about Sudduth's gang membership as evidence she was afraid to testify truthfully. Confronted with the

---

[3] Two firearms, neither of which was used in the shooting, were found in a drawer in Sudduth's home. Evidence of these weapons was not admitted at trial.

4

statement, Holland denied she was afraid to testify and claimed Hun had misunderstood her. According to Holland, she had been referring to the fact that many people in the neighborhood knew and associated with members of the Carver Park Compton Crips but she had no personal knowledge that Sudduth was a gang member. Nelson and Holland each admitted they had consumed sizable quantities of vodka and smoked several marijuana cigarettes before the shooting. Franco testified he could tell Holland had been drinking but she did not appear to be impaired while he was speaking with her after the shooting. On cross-examination Nelson, Holland and Lee were also impeached with evidence each had suffered several prior convictions.

Two new pieces of evidence emerged at trial. Asked for the first time if she had spoken with Sudduth since the shooting, Nelson testified he had called her a month after the shooting to apologize. When she recognized his voice, she hung up the phone because she was angry and would not forgive him for shooting her. In addition, Lee testified he had seen a white sedan backing out of the driveway immediately after the shooting, something he had failed to disclose during the investigation. However, he did not know who owned the car.

Sudduth did not testify at trial. Gary Cooper, an investigator for the defense, testified he had interviewed Holland several months before trial and she had denied she had seen the shooter. A recording of that conversation was played for the jury. Cooper also visited Nelson's apartment on two occasions to inspect evidence of the shooting. On the second visit he was accompanied by Anthony Paul, a firearms examiner who also testified for the defense. Cooper and Paul measured the bullet holes in the security door and matched one of them to a bullet hole in the interior wall of the apartment. Based on these measurements, Paul opined it was not possible that the shots could have been fired by someone sitting in a vehicle parked in the driveway.

4. *The Verdicts and Sentencing*

After deliberating for less than three hours, the jury convicted Sudduth on both charges and found the section 12022.7, subdivision (a), and section 12022.53, subdivision (d), enhancement allegations true. In a bifurcated proceeding the court found

5

true the allegations Sudduth had suffered a prior serious conviction within the meaning of the three strikes law and section 667, subdivision (a).

Sudduth represented himself at sentencing. After the court declined to dismiss the prior strike conviction, Sudduth was sentenced to an aggregate state prison term of 40 years to life: The five-year middle term for shooting at an inhabited dwelling doubled to 10 years for the prior strike conviction, plus five years for the serious felony enhancement and 25 years to life for personal use of a firearm causing great bodily injury. The term for the great bodily injury enhancement was stayed pursuant to section 654. The sentence on count 2, based on the middle term of two years for possession of a firearm by a felon, was imposed to run concurrently with the sentence on count 1.

## CONTENTIONS

Sudduth contends the trial court abused its discretion and violated his constitutional rights by permitting the amendment of the information on the first day of trial to include the section 12022.53 firearm-use allegations and in admitting evidence of his possible gang affiliation. He also contends there was insufficient evidence to support the jury's findings he was the shooter and was in possession of a firearm. He also asks us to review the sealed record of the *Pitchess* hearing to determine whether proper procedures were followed and whether the record is sufficient. Finally, Sudduth contends the court abused its discretion in failing to dismiss his prior strike conviction and challenges his sentence as cruel and unusual under the federal and state constitutions.

The People seek correction of the judgment to modify the fees imposed by the trial court.

## DISCUSSION

1. *The Trial Court Did Not Abuse Its Discretion in Permitting the Amendment of the Information To Add Firearm-use Allegations Under Section 12022.53*

The trial court may permit amendment of an information at any time during the proceedings, even after the evidence has closed, provided the amendment is supported by evidence at the preliminary hearing and does not prejudice the defendant's substantial

6

rights. (§ 1009;[4] *People v. Birks* (1998) 19 Cal.4th 108, 129; *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1581; see also *People v. Graff* (2009) 170 Cal.App.4th 345, 367 ["'[A] preliminary hearing transcript affording notice of the time, place and circumstances of charged offenses "'is the touchstone of due process notice to a defendant'"'"].)  A trial court's decision to permit the amendment of an information will not be reversed absent a showing of a clear abuse of discretion.  (*People v. Bolden* (1996) 44 Cal.App.4th 707, 716; *People v. Flowers* (1971) 14 Cal.App.3d 1017, 1020.)

Section 12022.53 authorizes "'"'substantially longer prison sentences" for "felons who use firearms in the commission of their crimes."'"'" (*People v. Palacios* (2007) 41 Cal.4th 720, 725.)  "Subdivision (b) provides a 10-year enhancement for using a firearm; subdivision (c) a 20-year enhancement for intentionally firing the gun; and subdivision (d) a 25-years-to-life enhancement for intentional discharge causing great bodily injury or death to someone other than an accomplice." (*Ibid.*)[5]  The People sought

_____

[4]     Section 1009 provides, "The court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings. . . . The defendant shall be required to plead to such amendment or amended pleading forthwith, . . . and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted.  An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination.  A complaint cannot be amended to charge an offense not attempted to be charged by the original complaint, except that separate counts may be added which might properly have been joined in the original complaint."

[5]     Section 12022.53, subdivisions (b), (c) and (d), provide:  "(b) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years.  The firearm need not be operable or loaded for this enhancement to apply.

"(c) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years."

7

to amend the information to add to count 1 the allegation that Sudduth had personally used, discharged and/or caused great bodily injury to Nelson within the meaning of section 12022.53, subdivisions (b), (c) and (d). Sudduth opposed the amendment, asserting he would have accepted the People's proffered plea if he had understood his sentence could include a life term.

Notwithstanding Sudduth's claim, permitting this amendment fell well within the court's discretion. The amendment was proposed on the first day of trial before a jury was impaneled. The amendment had no effect on the nature of the criminal offenses and enhancements to be proved at trial or on Sudduth's defense of misidentification. That such an additional enhancement allegation could be made was clearly foreseeable from the evidence adduced at the preliminary hearing and the charges contained in the information: From the outset the People intended to prove Sudduth had personally discharged a firearm into an inhabited dwelling in a manner that caused Nelson to suffer great bodily injury; adding the section 12022.53 firearm-use allegations did not expand that in any way. Simply put, Sudduth, who had elected to represent himself at the preliminary hearing and during plea negotiations, apparently failed to understand the significance of the People's evidence or his overall exposure based on what could be proved at trial.

Nor did the amendment violate Sudduth's due process rights. "Due process of law requires that an accused be advised of the charges against him [or her] so that he [or she] has a reasonable opportunity to prepare and present [a] defense and not be taken by surprise by evidence offered at . . . trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317; see *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1201; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 554.) Although Sudduth claims he was "actually" surprised by the

---

"(d) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

8

amendment, as we have explained, the preliminary hearing gave him notice of the facts to be relied upon by the People in support of the charges as well as the subsequent amendment. The amendment came at the beginning of trial, when the defense had time to make any adjustments in the defense strategy, especially given the straightforward and relatively simple nature of the case. The amendment did not in any way prejudice Sudduth's substantial rights. (See *Fernandez,* at p. 554 ["a defendant's due process rights are not prejudiced by amendment of the information . . . so long as defendant's substantial rights are not prejudiced"].)

2. *The Admission of Gang Evidence, Even if Erroneous, Was Harmless*

"A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion. [Citations.] The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193; accord, *People v. Memory* (2010) 182 Cal.App.4th 835, 858; see *People v. Williams* (1997) 16 Cal.4th 153, 197 ["a trial court's decision to admit or not admit evidence, whether made *in limine* or following a hearing pursuant to [Evid. Code, § 402] is reviewed only for abuse of discretion"].) Even when an abuse of discretion is found, "[t]he erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded." (*Avitia,* at p. 194.) It is the defendant's burden on appeal to establish an abuse of discretion and prejudice. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 275.)

To be sure, the admission of gang evidence always carries a risk of prejudice. "When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact." (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Nonetheless, gang evidence, including evidence about a defendant's gang membership, is generally admissible if it is relevant to a material issue in the case other than criminal disposition, is not more prejudicial than

9

probative, and is not cumulative. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167; *People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).) Gang evidence, however, is not admissible if introduced "only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' In cases not involving a section 186.22 gang enhancement, it has been recognized that 'evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]' [Citations.] Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, 'trial courts should carefully scrutinize such evidence before admitting it.'" (*People v. Avitia, supra,* 127 Cal.App.4th at pp. 192-193; accord, *Albarran,* at pp. 224-225.)

Evidence of gang membership may be admitted, as it was here, to prove bias or otherwise challenge the credibility of a witness's testimony, provided it is not cumulative to other properly admitted and less inflammatory evidence. (See *People v. Adams* (2014) 60 Cal.4th 541, 570 ["""Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court."""]; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905 [finding prejudicial error when prosecutor allowed to impeach defense witnesses for bias by showing they belonged to same gang; bias had been amply established by other evidence]; *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1497-1498 [evidence of defendants' common gang membership cumulative when other evidence established close personal relationship].) "'It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.'" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450; accord, *Adams,* at p. 37.)

After granting Sudduth's motion in limine to exclude any reference to his possible gang membership, the People sought to undermine Holland's refusal at trial to identify Sudduth as the shooter with her statement to Detective Hun that Sudduth was a member

10

of the Carver Park Compton Crips to explain her reluctance to repeat her previous identification of him.  The court allowed the testimony on the theory Holland was afraid of retribution.  Sudduth's counsel objected vigorously to this ruling, observing that Sudduth at age 51 was unlikely to be an active gang member and that the wholly uncorroborated statement was unduly prejudicial.

While the basis for the court's ruling was not without support in case law, as discussed, this shooting had no gang overtones.  Instead, the attack was rooted in wounded (and drunken) male pride.  Sudduth's attempt to apologize to Nelson demonstrates remorse for his actions rather than an attempt to intimidate her.  No one asked Holland whether she similarly had resumed her contact with Sudduth, and there was no evidence she was afraid of him.  To the contrary, they had been friends for nearly 20 years.  Under these circumstances it is at least equally likely Holland decided she did not want to testify against a friend or to help the prosecution.  Even assuming she was afraid of Sudduth, as defense counsel pointed out, her fear was more likely engendered by his extreme reaction to the practical joke, not any possible gang membership.  Holland, predictably, answered she was not afraid to testify and denied telling Hun that Sudduth was a gang member.  The court, as promised, gave a limiting instruction.[6]  Also predictably, the prosecutor revisited the issue both in questioning of Holland and in closing argument, which she ended by stating Holland was too afraid to tell the jury "what the gang member from her neighborhood had done."  As this sequence shows, once admitted, gang evidence has the capacity to dwarf other issues in the case.

---

[6]     The court interrupted the prosecutor to interject, "Let me just [say] before you move on . . . I want to make sure that all of you understand that to the extent evidence is offered directly or indirectly regarding gang membership on the defendant's part, it is not offered for the truth of the matter asserted.  You are not to consider it for that purpose, which is to say if you conclude that the defendant is or may have in the past been a gang member, you don't presume from that that he is more likely than not to have committed the offense or is a bad person or anything of that sort.  It is to be considered by you only, that is, exclusively for its impact on the witness in assessing the witness's credibility.  Consider it for that purpose and . . . none other.  Does everyone understand?  Yes.  Everyone is indicating yes.  Thank you."

11

Nonetheless, in light of the broad discretion accorded trial courts on evidentiary questions, it is difficult to conclude the court abused its discretion in allowing the prosecutor to ask whether Holland was frightened to testify because she believed Sudduth was a gang member. Moreover, in light of Nelson's testimony that Sudduth, whose voice she instantly recognized, called her to apologize a month or so after the shooting, any error was harmless under either the federal constitutional standard (see *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663 [*Chapman* harmless-error inquiry asks whether it is clear beyond a reasonable doubt a rational jury would have found the defendant guilty absent the error]) or the state law harmless error standard (see *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Partida* (2005) 37 Cal.4th 428, 439 [under *Watson* test, "reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error"]). As defense counsel aptly pointed out during his scramble to find a way to exclude the statement or mitigate its impact, that testimony by Nelson was devastating to Sudduth's misidentification defense.

3. *The Trial Court Used the Proper Procedures in Reviewing Information Responsive to Sudduth's* <u>Pitchess</u> *Motion*

Prior to trial Sudduth moved under Evidence Code section 1043 and *Pitchess v. Superior Court, supra,* 11 Cal.3d 531 for a review of the personnel records of several Los Angeles police officers. The trial court agreed to inspect the records of Officers Franco, Cardenas, Vargas, Hun, Estrada, Esparra and Williams to determine whether any of these officers had a history of misconduct relating to racial prejudice, use of excessive force or violence, false arrest, falsification of reports, illegal search and seizure or acts of dishonesty. The court reviewed the requested records in camera and found no discoverable information.

At Sudduth's request, which the People did not oppose, we have reviewed the sealed record of the in camera proceedings and conclude the trial court satisfied the minimum requirements in determining whether there was discoverable information. No abuse of discretion occurred. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225.)

12

4. *Sufficient Evidence Supported The Jury's Verdicts*

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Sudduth contends the verdicts lack sufficient factual support for the jury's findings he was the shooter and was in possession of a firearm. As discussed, Nelson's testimony Sudduth had called her to apologize for shooting her was sufficient evidence on both of these points. Even without that testimony, the evidence would have been sufficient to convict him on each count based on the Holland's identification of him to the responding officers and the investigating detective in the aftermath of the shooting. The combination of this testimony left an indelible impression of guilt; indeed, the jury deliberated for only three hours before finding Sudduth guilty.

5. *The Trial Court Did Not Abuse Its Discretion by Declining To Dismiss Sudduth's Prior Strike Conviction*

Section 1385, subdivision (a), vests the court with discretion to dismiss a qualifying strike conviction "in furtherance of justice." (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530; *People v. Williams* (1998) 17 Cal.4th 148, 158.) "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . or in reviewing such a ruling, the court . . . must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [three strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams,* at p. 161.)

We review the trial court's decision not to dismiss a prior strike allegation under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 376.) "[T]he three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper. [¶] . . . [¶] . . . '[I]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations. . . . Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Id.* at p. 378.)

Sudduth contends the trial court abused its discretion in failing to dismiss the prior strike conviction for first degree burglary, which occurred on March 12, 1985, 28 years

14

before the trial commenced. He acknowledges the remoteness of a strike is not determinative (see, e.g., *People v. Williams, supra,* 17 Cal.4th at p. 163 [13-year-old strikes]) but contends it should be considered among the circumstances of the strike (*id.* at p. 161). In arguing to the trial court he pointed out he had been out of jail for 18 years during which time he had provided for his family and had suffered no felony convictions during the 15 years preceding this case. He also asserted it was not fair to label him as a gang member or "rotten citizen."

After reviewing Sudduth's record the trial court stated, "You have spent time in state prison as much as 12 years [on the 1985 burglary conviction] . . . and have been convicted of a number of things. It's not as long as some records, but it's serious offenses. . . . What concerns me greatly is just the degree of depravity involved in this particular case. . . . People play a practical joke on you and you get upset and arm yourself and start shooting at these people. It's amazing to me and it's only out of sheer fortuity that this isn't a murder prosecution. . . ."[7] The court then announced its sentence.

Although it would have been within the court's discretion to dismiss the 1985 strike, it was not an abuse of that discretion to decide not to do so. Sudduth has not led a legally blameless life after suffering his strike conviction. (See *People v. Williams, supra,* 17 Cal.4th at p. 163 [passage of 13 years between strike offense and new offense not significant given defendant's failure to refrain from criminal activity in the interim]; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 [trial court abused its discretion by striking 20-year-old prior where defendant did not subsequently lead a legally blameless

---

[7] Sudduth spent five years confined to the California Youth Authority as a juvenile. As an adult he suffered a misdemeanor conviction for grand theft property in 1983; was detained on a vehicular manslaughter charge in the same year; was convicted of petty theft in 1984; was convicted of assault with a deadly weapon and first degree burglary in 1985 (for which the court imposed a 12-year state prison sentence); was detained in 1992 on an assault/mayhem/rape charge and imprisoned for a parole violation; was convicted of petty theft with a prior conviction in 1992 and sentenced to 16 months in state prison; and was convicted of possession of a firearm by a felon in 1995 and again sentenced to 16 months in state prison. In October 2000, October 2004 and February 2006 he was convicted of driving with a suspended license.

15

life]; *People v. Jefferson* (2007) 154 Cal.App.4th 1381, 1388 [declining to strike 22-year-old strike].) Moreover, as the court observed, the strike added only five years to Sudduth's sentence of 40 years to life. Nothing in Sudduth's argument convinces us the court abused its broad discretion.

6. *The Sentence Did Not Constitute Cruel or Unusual Punishment*

Sudduth contends his sentence of 40 years to life constitutes cruel and unusual punishment in violation of the Eight Amendment to the United States Constitution and cruel or unusual punishment in violation of the California Constitution. Sudduth has forfeited these arguments by failing to raise them in the trial court. (See, e.g., *People v. Norman* (2003) 109 Cal.App.4th 221, 229 [cruel and unusual punishment arguments must be raised in trial court because they require fact-specific determinations about the offense and the offender]; see also *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045; *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) In any event, they fail on their merits.

The Eighth Amendment's ban on cruel and unusual punishment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20-21 [123 S.Ct. 1179, 155 L.Ed.2d 108].) In *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the Supreme Court recognized that punishments prohibited as unconstitutionally disproportionate to the offense generally fall into two classifications: Those that are categorically prohibited, and those that are prohibited based on the facts of a particular case. (*Ewing*, at pp. 58-59.)

To determine whether a particular sentence is so grossly disproportionate that it violates the federal Constitution, the court considers all the circumstances of the case, including the gravity of the offense and the severity of the penalty as well as whether more serious crimes are subject to the same penalty in other jurisdictions. (*Graham, supra*, 560 U.S. at p. 58; *Solem v. Helm* (1983) 463 U.S. 277 [103 S.Ct. 3001, 77 L.Ed.2d 637].) No single criterion is dispositive. (*Solem,* at p. 291, fn. 17.) "'[O]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.'" (*Id.* at p. 290, quoting *Rummel v. Estelle* (1980)

16

445 U.S. 263, 271 [100 S.Ct. 1133, 63 L.Ed.2d 382].)  Still, although deference is given to the Legislature's prescribed sentence for a particular crime (*Solem,* at p. 290), no penalty is per se constitutional.  (*Ibid.*)

Similarly, under state law Sudduth must overcome a "considerable burden" in challenging his penalty as cruel or unusual.  (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)  He must demonstrate the punishment is so disproportionate to the crime for which it was imposed it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*); accord *People v. Dillon* (1983) 34 Cal.3d 441, 478.)  The *Lynch* court identified three factors for the reviewing court to consider in assessing this constitutional claim:  (1) the nature of the offense and the offender; (2) how the punishment compares with punishments for more serious crimes in the jurisdiction; and (3) how the punishment compares with the punishment for the same offense in other jurisdictions.  (*Lynch,* at pp. 425-427.)

Sudduth contends section 12022.53, subdivision (d), constitutes cruel and/or unusual punishment on its face and as applied to him and that his overall sentence of 40 years to life violates the federal and state constitutions as applied.  Sudduth's facial challenge to section 12022.53, subdivision (d), arises from its "draconian enhancement of [a sentence by] 25 years to life . . . regardless of the circumstances of the shooting or the severity of the injury or injuries."  Sudduth acknowledges two appellate courts have held to the contrary (*People v. Martinez* (1999) 76 Cal.App.4th 489 and *People v. Zepeda* (2001) 87 Cal.App.4th 1183) but contends these cases were wrongly decided and should not be followed.

We disagree.  In rejecting the contention that section 12022.53 is facially unconstitutional because the statute does not recognize significant gradations of culpability and fails to account for mitigating circumstances, our colleagues in Division Four of this court explained:  "Section 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies. . . . The statute then sets forth three gradations of punishment based on increasingly serious

17

types and consequences of firearm use in the commission of the designated felonies: 10 years if the defendant merely used a firearm, 20 years if the defendant personally and intentionally discharged it, and 25 years to life if the defendant's intentional discharge of the firearm proximately caused great bodily injury. Furthermore, the provision in question is an enhancement to the base term for the underlying conviction; a trial court retains flexibility as to fixing the underlying base term for [the underlying crime]." (*People v. Martinez, supra,* 76 Cal.App.4th at p. 495.) The *Martinez* court also rejected the related argument section 12022.53 arbitrarily imposes severe punishment in cases involving criminal use of a gun compared to other dangerous or deadly weapons: "[T]he Legislature determined in enacting section 12022.53 that the use of firearms in commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives." (*Martinez,* at pp. 497-498.) *Martinez* concluded, "Lines must be drawn somewhere, and the Legislature has reasonably drawn the line at great bodily injury. The fact that [section 12022.53,] subdivision (d) leaves no additional room for trial court discretion based on different gradations of great bodily injury does not render the punishment cruel or unusual." (*Martinez,* at p. 495; accord, *People v. Zepeda, supra,* 87 Cal.App.4th at pp. 1214-1215.)

We also reject Sudduth's contention his overall sentence, as well as the section 12022.53, subdivision (d), enhancement, is unconstitutional as applied to him. Faced with the argument a particular punishment is cruel or unusual, courts examine the nature of the offense and of the offender, "'with particular regard to the degree of danger both present to society.'" (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) In assessing the nature of the offense, a court should consider the circumstance of the particular offense such as the defendant's motive, the way the crime was committed, the extent of his involvement and the consequences of his acts. (*Ibid.*) In analyzing the nature of the

18

offender, a court should consider his "age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) "[A] punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Id.* at p. 480.)

There is nothing about Suddeth's crime that distinguishes it from the many cases upholding firearm-use sentence enhancements against similar challenges. (See, e.g., *People v. Em* (2009) 171 Cal.App.4th 964, 973-974; *People v. Felix* (2003) 108 Cal.App.4th 994, 1000-1002; *People v. Taylor* (2001) 93 Cal.App.4th 318, 323-324; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 18-19; see also *People v. Wingo*, *supra*, 14 Cal.3d at p. 174 [defendant must overcome a "considerable burden" in challenging his penalty as cruel or unusual].) Irrationally angered by a harmless practical joke played on him by friends he had known for nearly 20 years, Sudduth, a person with a substantial criminal record who, at the age of 51 should have long ago learned to curb such impulses, left the apartment, retrieved a gun, returned and fired it multiple times into the room he knew was occupied, seriously injuring Nelson. As our Division Six colleagues observed in rejecting a similar argument, "Firearms and felons do not mix. Firearms and alcohol do not mix. Firearms and poor judgment do not mix. Here we have all three and it was a recipe for disaster. This mixture could have easily resulted in . . . multiple deaths." (*People v. Vallejo, supra,* 214 Cal.App.4th at p. 1045.) This case, too, could have easily been a murder prosecution. Sudduth has not demonstrated his case is that "exquisite rarity" where the sentence is so harsh as to shock the conscience or offend fundamental notions of human dignity. (See *People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1631.)[8]

Accordingly, there is no basis to find the sentence unconstitutional under either the United States or California Constitutions. His state prison sentence of 40 years to life

---

[8] Sudduth also contends imposing a 40-year sentence on a 53-year-old (at the time of trial) man, far in excess of his life expectancy, is cruel and unusual per se. Numerous courts have rejected this contention. (See *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230-1231; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1090; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383.)

19

was properly based on his current crimes, his recidivist behavior and his lack of progress toward rehabilitation.  (See, e.g., *People v. Cooper* (1996) 43 Cal.App.4th 815, 825-826.)

7.  *Remaining Issues*

In light of our decision finding no error by the trial court, we reject Sudduth's contention the cumulative effect of errors he raised prejudiced him unfairly.  We also direct the superior court clerk to correct the abstract of judgment to add the mandatory fees identified by the People.  (See *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [an unauthorized sentence may be corrected at any time].)

**DISPOSITION**

The judgment is modified (1) to impose separate court assessments of $40 for each of the two counts pursuant to section 1465.8, subdivision (a)(1); (2) to delete the $30 assessment originally imposed under that section; and (3) to impose an additional $30 court construction fee pursuant to Government Code section 70373, subdivision (a).  As modified, the judgment is affirmed.  The superior court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


PERLUSS, P. J.


We concur:



ZELON, J.



SEGAL, J. [*]

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20